*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0321P (6th Cir.)
File Name: 04a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMSOUTH BANK (03-5517);
FIRST TENNESSEE BANK
(03-5521),
    *Plaintiffs-Appellees,*

*v.*

GEORGE DALE et al.,
    *Defendants-Appellants.*

Nos. 03-5517/5521

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville
Nos. 02-00677; 02-00683—William J. Haynes, Jr.,
District Judge.

Argued: June 9, 2004

Decided and Filed: September 21, 2004

Before: BOGGS, Chief Judge; MOORE, Circuit Judge;
QUIST, District Judge.*

———————————

*The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Robert S. Michaels, ROBINSON, CURLEY &
CLAYTON, Chicago, Illinois, for Appellants. Larry B.
Childs, WALSTON, WELLS, ANDERSON & BAINS,
Birmingham, Alabama, Leo M. Bearman, Jr., BAKER,
DONELSON, BEARMAN, CALDWELL & BERKOWITZ,
Memphis, Tennessee, for Appellees. **ON BRIEF:** Robert S.
Michaels, Alan F. Curley, Robert L. Margolis, ROBINSON,
CURLEY & CLAYTON, Chicago, Illinois, for Appellants.
Larry B. Childs, Randall D. Quarles, WALSTON, WELLS,
ANDERSON & BAINS, Birmingham, Alabama, Leo M.
Bearman, Jr., R. Mark Glover, BAKER, DONELSON,
BEARMAN, CALDWELL & BERKOWITZ, Memphis,
Tennessee, Samuel T. Bowman, BAKER, DONELSON,
BEARMAN, CALDWELL & BERKOWITZ, Nashville,
Tennessee, Anthony J. McFarland, Catherine A. Colley,
David R. Esquivel, BASS, BERRY & SIMS, Nashville,
Tennessee, for Appellees.

MOORE, J., delivered the opinion of the court, in which
QUIST, D. J., joined. BOGGS, C. J., concurred in the
judgment only.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. Defendants-
Appellants George Dale ("Dale"), Scott B. Lakin, Carroll
Fisher, and Mike Pickens,[1] all commissioners of insurance or

———————————

[1]Mike Pickens is a defendant only in the action brought by First
Tennessee Bank, and not that brought by AmSouth Bank, and therefore
is a party only to Appeal No. 03-5521.

the equivalent for their respective states, who were sued in their official capacity as receivers for various insolvent insurance companies (collectively, "Receivers"), appeal from the district court's grant of a preliminary injunction barring them from pursuing their coercive action originally filed in Mississippi state court in these ongoing declaratory judgment suits brought by Plaintiffs-Appellees AmSouth Bank ("AmSouth") and First Tennessee Bank ("FTB") (collectively, "Banks"). The Receivers argue that the district court improperly entertained this action, because it lacked jurisdiction or because it should have declined jurisdiction in its discretion. Because the district court abused its discretion in entertaining these declaratory actions, we **DISSOLVE** the injunction, **REVERSE** the district court's decision, and **REMAND** the case to the district court with instructions to dismiss the actions.

## I. BACKGROUND

This case concerns the latest effort of the Receivers to recover some of the funds embezzled from a number of southern insurance companies by the infamous Martin Frankel ("Frankel"). *See, e.g., Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir. 2003); *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411 (2d Cir. 2001); *Dale v. ALA Acquisitions, Inc.*, 203 F. Supp. 2d 694 (S.D. Miss. 2002); *Dale v. Frankel*, 206 F. Supp. 2d 315 (D. Conn. 2001). Frankel had purchased seven insurance companies in five states through various entities, while at the same time controlling the unregistered brokerage that was supposedly investing the large cash reserves that insurance companies typically have on hand. Instead, he was funneling the money to overseas bank accounts. Dale, insurance commissioner for Mississippi, became suspicious and placed the Frankel-controlled insurance companies under state supervision, and in May 1999, Frankel fled the country as his scheme dissolved. Frankel was the subject of a four-month, worldwide manhunt, culminating in his capture in Germany.

Frankel pleaded guilty to numerous charges in the United States District Court for the District of Connecticut.

Bank accounts used in Frankel's money-laundering scheme were held by the insurance companies at both AmSouth, from 1991 to 1999, and FTB, from 1997 to 1999. Essentially, the Receivers argue that the Banks were negligent in not realizing the massive fraud that those accounts were being used to commit. In the course of the receivership proceedings, the Receivers concluded they might have claims against AmSouth, and contacted AmSouth to begin settlement discussions. On June 28, 2001, attorneys for AmSouth and the Receivers executed on behalf of their clients a tolling agreement through August 27, 2001. That tolling agreement was extended six times, through July 31, 2002. During the pendency of that tolling agreement, negotiations were ongoing; on September 27, 2001, explicitly "for settlement purposes," the Receivers sent draft allegations to AmSouth. Joint Appendix No. 03-5517 ("J.A. AmS") at 566. On June 28, 2002, the Receivers' counsel sent a draft complaint that they intended to file "on or before July 31, 2002" if that "effort at compromise [was] unsuccessful," including a "written, pre-filing demand" that AmSouth had "asked [the Receivers] to make," and indicating that the settlement offer would expire on July 10. J.A. AmS at 567-68. On July 10, 2002, AmSouth's counsel sent a letter to the Receivers' counsel indicating that AmSouth's counsel had discussed settlement and litigation options with their client, but requested 1) a meeting "among the parties and their counsel"; 2) an insurance-company-by-insurance-company breakdown of damages suffered; and 3) an extension of the time for response through July 19. J.A. AmS at 570. A phone conversation between counsel took place on July 15, 2002, the contents of which are contested, but which likely led to some sort of agreement that the extension had been approved. On July 17, 2002, AmSouth's counsel sent a letter regarding the Receivers' ongoing concerns with respect to Federal Rule of Evidence 408, governing the disclosure of settlement

discussions, in which the last paragraph stated that AmSouth was "still considering" the Receivers' demand and AmSouth's options, and that counsel would "be in touch in the near future concerning a written response and a possible meeting on July 24." J.A. AmS at 572. On July 18, 2002, counsel for the Receivers sent a letter formalizing their approval of the extension to July 19, 2002, for a response to their settlement offer, indicating their openness to a meeting on July 24, and including a detailed breakdown of damages by bank account. Unbeknownst to the Receivers, on July 18, 2002, AmSouth had filed a complaint for declaratory relief in the U.S. District Court for the Middle District of Tennessee. On July 19, 2002, AmSouth sent a letter formally rejecting the settlement offer, but failing to mention the suit they had filed the previous day. The Receivers learned of the filing through the call of a newspaper reporter on July 19.

Negotiations with FTB took place in a shorter period of time, but followed a similar track. In May 2002, the Receivers' counsel initiated negotiations with FTB through phone conversations; to this end, they signed a tolling agreement that extended from May 3 through May 31, 2002. This agreement was extended once, on May 24, 2002, through July 31, 2002 (the same date as the final date of the AmSouth tolling agreement). In July 2002, FTB requested a formal settlement demand; while Receivers' counsel was drafting this demand, they learned that FTB had filed the instant declaratory judgment action in the Middle District of Tennessee.

On July 31, 2002, at the end of the tolling period, the Receivers filed an action in Mississippi state court against both AmSouth and FTB ("the Mississippi litigation"). AmSouth removed the action to the U.S. District Court for the Southern District of Mississippi with FTB's consent on September 5, 2002, based on alleged improper joinder of FTB, and asserted complete preemption of the Receivers' claims under Federal Reserve Board Regulation J, 12 C.F.R.

§ 210.25 *et seq.* ("Regulation J"), governing wire transfers. FTB then filed a motion to dismiss for improper venue, or in the alternative to transfer the case, on September 26, 2002. On October 7, 2002, the Receivers filed a remand motion. When the Middle District of Tennessee ("district court") decided in the instant actions to enjoin the further prosecution of the Mississippi litigation, the Mississippi litigation was stayed by the federal district court in Mississippi.

In the instant actions (collectively, "the Tennessee litigation"), AmSouth and FTB ask for declaratory relief that they are not liable to the Receivers, relying both on federal law and state law defenses, and both complaints ask the district court to enjoin the Receivers from bringing any future lawsuits and require them instead to bring all claims as counterclaims in the Tennessee litigation. The Receivers filed motions to dismiss both FTB's and AmSouth's actions on August 23, 2002. A hearing was held on that motion on January 13, 2003, and the district court issued its decision and orders denying the motions to dismiss and enjoining further prosecution of the Mississippi litigation on March 31, 2003. A timely notice of appeal was filed in each case on April 4, 2003.

Subsequently, the Mississippi litigation was stayed on April 16, 2003. In mid-2003, apparently out of concern for risking mounting legal fees for a limited potential recovery, Paula Flowers, Commissioner of Commerce and Insurance for the State of Tennessee, then a defendant in the Tennessee litigation and a plaintiff in the Mississippi litigation, decided that Tennessee should withdraw from the Mississippi litigation, and in response, FTB and AmSouth agreed to dismiss her from the Tennessee litigation. *See* Getahn Ward, *Tennessee Pulls Out of Suit Against 2 Banks*, THE TENNESSEAN, July 29, 2003, at 4E. On June 23, 2003, Flowers filed a motion to dismiss her appeals in this court which we granted on June 25, 2003; on June 26, 2003, Flowers's claims in the Mississippi litigation were dismissed

with prejudice; on July 18, 2003, FTB and AmSouth's claims against Flowers in the Tennessee litigation were dismissed in the district court. Finally, in the district court below, which has continued proceedings during this interlocutory appeal, having denied Receivers' motions to stay same, FTB and AmSouth have moved for summary judgment, and oral argument on the motion was held on May 26, 2004.

## II.  ANALYSIS

### A.  Appellate Jurisdiction

#### 1.   Whether the Injunction is Appealable under § 1292(a)(1)

The Banks argue that this court lacks appellate jurisdiction over the district court's order enjoining the Receivers from further prosecution of the Mississippi litigation. FTB argues first that the district court's order was not an "injunction" within the meaning of the statute, and therefore, as merely an order with the practical effect of an injunction, subject to the "serious, perhaps irreparable, consequence" limitation under *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981) (internal quotation marks omitted), in order to be appealable under 28 U.S.C. § 1292(a)(1). FTB next argues that this court should follow the Third Circuit in holding that an injunction against litigating in another forum is not an appealable injunction, as not going to the ultimate relief demanded by the plaintiff. *See Hershey Foods Corp. v. Hershey Creamery Co.*, 945 F.2d 1272 (3d Cir. 1991).

"Section 1292(a)(1) . . . provide[s] appellate jurisdiction over orders that grant or deny injunctions and orders that have the practical effect of granting or denying injunctions and have '"serious, perhaps irreparable, consequence."'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 287-88 (1988). FTB argues that the injunction below falls into the second, rather than the first category. This

contention rests on the lack of a motion under Federal Rule of Civil Procedure 65 in the district court by either FTB or AmSouth asking for the injunction issued by the district court. FTB relies on *I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc.*, 789 F.2d 21, 24 n.3 (D.C. Cir.), *cert. denied*, 479 U.S. 971 (1986), which notes that "*Carson*['s requirement of serious or irreparable consequence] does not apply to an order clearly granting or denying a specific request for injunctive relief." *See also MAI Basic Four, Inc. v. Basis, Inc.*, 962 F.2d 978, 980 n.3 (10th Cir. 1992) (noting that while the motion for the injunction was not pursuant to Rule 65, "this is a Rule 65(a) motion in all but name," and relying on that characterization in distinguishing *Hershey*). But both FTB's and AmSouth's complaints specifically ask for injunctive relief against the Receivers' prosecution of claims in other forums. It is therefore rather disingenuous of FTB to claim the district court issued the injunction "sua sponte." In any case, it is difficult to see what difference this distinction would make; if the order would be appealable had a party requested it, that the district court issued an order sua sponte cannot insulate the order from review. *See Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 129-30 (5th Cir. 1990) (finding appealable an order granting relief that "[n]either party had moved formally for," because the "challenged order prevents [the defendant] from taking any 'further action in any state or federal court'" and was therefore an injunction); *FDIC v. Santiago Plaza*, 598 F.2d 634, 635-36 (1st Cir. 1979) (district court issued order sua sponte but circuit court still applied general rule that injunctions against proceedings in other courts are appealable under § 1292(a)(1)).

Next, FTB argues that this circuit should go against the weight of authority and adopt the Third Circuit's outlier opinion in *Hershey*. *Hershey* held that an injunction, issued in a coercive trademark action in the Middle District of Pennsylvania, against prosecution of a "motion for order construing and enforcing" an earlier consent judgment

between the parties in the Southern District of New York, was not appealable under the earlier Third Circuit en banc decision in *Cohen v. Board of Trustees of the University of Medicine and Dentistry*, 867 F.2d 1455 (3d Cir. 1989). *Hershey*, 945 F.2d at 1279. *Hershey*'s rule has not been adopted by any other circuit. Instead, courts have held, "An order that prohibits a party from pursuing litigation in another forum unquestionably is an injunction for purposes of § 1292(a)(1), despite a carefully reasoned rejection of this proposition by the Third Circuit." 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3923, at 123 (2d ed. 1996). *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 n.6 (2d Cir. 1995) (quoting § 3923); *MAI Basic Four*, 962 F.2d at 981-82 (same); *Phillips*, 894 F.2d at 130 (rule in Fifth Circuit is that orders prohibiting proceedings in other courts are always appealable as injunctions); *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1461 (Fed. Cir. 1990) ("[T]he grant of an injunction against continuing suit in another forum is appealable as of right [under] 28 U.S.C. § 1292(a)."); *Asset Allocation & Mgmt. Co. v. W. Employers Ins. Co.*, 892 F.2d 566, 568 (7th Cir. 1989) (injunction against proceeding in pending litigation in other court was appealable under 28 U.S.C. § 1292(a)(1)); *Santiago Plaza*, 598 F.2d at 635-36 (An "injunction against appellant proceeding in state court . . . is clearly appealable under 28 U.S.C. § 1292(a)(1)."). Most fatal to FTB's argument, a prior Sixth Circuit case treated an injunction against prosecution of other litigation as an appealable injunction. *See Guy v. Citizens Fid. Bank & Trust Co.*, 429 F.2d 828, 831 (6th Cir. 1970) (district court's injunction restraining parties from prosecuting certain actions was an appealable order under § 1292(a)(1)).[2]   Finally, even

under the *Hershey* test, this injunction would be appealable, as it contains relief sought in the complaint. The whole point of this litigation is to prevent the Receivers from prosecuting claims against FTB and AmSouth.

## 2. The Scope of This Court's Review

On appeal, the Receivers argue that the reasons given in their motion to dismiss each independently require dissolution of the injunction. *See* infra note 3. The Banks object on the basis of this court's limited appellate jurisdiction, arguing that this court can only narrowly evaluate the propriety of the injunction, without reference to the Receivers' arguments. This seems deliberately to misunderstand the nature of those arguments: because each of them goes to the power of the district court to exercise jurisdiction over these actions or its discretionary responsibility to decline to do so, they all go to the "merits" of the injunction issued by the district court, which was premised on the proper assumption of jurisdiction. The Banks' admonition that this court should only review the propriety of the injunction, without examining whether the case was properly in the district court in the first place, defies logic. While not all of the Receivers' arguments are strictly jurisdictional in the sense of attacking the bare power of the district court to hear the case, they are all jurisdictional in the sense that they attack the propriety of the district court's

---

[2] *Coleman v. American Red Cross*, 979 F.2d 1135, 1137 (6th Cir. 1992), cited by the Receivers, holds this sort of injunction appealable under the collateral order doctrine, rather than § 1292(a)(1), which doctrine renders appealable a "preliminary or interim decision . . . when

it (1) 'conclusively determine[s] the disputed question,' (2) 'resolve[s] an important issue completely separate from the merits of the action,' and (3) is 'effectively unreviewable on appeal from a final judgment.'" *Sell v. United States*, 539 U.S. 166, 176 (2003) (alterations in original). This separate basis for review is unnecessary in the face of the explicit language of § 1292(a)(1), however. *American Motors Corp. v. FTC*, 601 F.2d 1329, 1331-32 (6th Cir.), *cert. denied,* 444 U.S. 941 (1979), dealt with a district court's direction to an administrative agency to cease its investigations, which was held appealable as an order having the substance of an injunction.

assumption of jurisdiction.[3]  The injunction is only proper as preventing duplicative litigation if the declaratory judgment action should have been allowed to proceed.  The "harm or effect" of the preliminary injunction that FTB faults the Receivers for not identifying and arguing is precisely what the Receivers are in fact arguing:  that for a plethora of reasons, their coercive action, the Mississippi litigation, is the proper vehicle for this dispute — the litigation which they were specifically prohibited from pursuing.

The Banks assert that the issues argued by the Receivers can only be recognized by this court under "pendent appellate jurisdiction," which allows unappealable orders to be reviewed only when they are "inextricably intertwined" with appealable orders; they then argue that the grant of the preliminary injunction is not so intertwined with the motion to dismiss.  *See Brennan v. Township of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1996).  While the Receivers disclaim any reliance on the doctrine of pendent appellate jurisdiction, arguing instead that under any meaningful scheme of review an appeal from an injunction necessarily sweeps up any issues that bear on the district court's power to issue the injunction, they do correctly note that in order to reverse the district court's denial of their motion to dismiss, this court would have to find that it had pendent appellate jurisdiction over that denial.  Because we conclude that the district court abused its discretion in entertaining this declaratory action, we necessarily decide that the denial of the Receivers' motion was improper, satisfying the "inextricably intertwined" rule.  *See id.* at 1158 ("Our finding on the first issue necessarily and

---

[3]The Receivers argue a lack of federal question jurisdiction and McCarran-Ferguson reverse preemption of the Declaratory Judgment Act, both of which would render the district court's injunction void for lack of jurisdiction over these actions, and that *Burford* abstention was proper and that these are not proper declaratory actions, which doctrines go to the discretionary assumption of jurisdiction and would render the injunction below an abuse of the district court's discretion.

unavoidably decides the second.").  We will therefore remand with orders to dismiss the actions in their entirety.

## B.  Subject Matter Jurisdiction in the District Court

The district court's jurisdiction over AmSouth's action was premised on both federal question and diversity jurisdiction, whereas its jurisdiction over FTB's action was premised solely on federal question jurisdiction.  In determining whether federal question jurisdiction was properly determined to exist in the district court, we look to the Receivers' threatened coercive action.  Because the Banks' actions are declaratory judgment actions "seek[ing] in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."  *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 248 (1952).  "Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law."  *Id.*; *see also Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 15-16 (1983) (reaffirming rule of *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), that "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking" (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2767 (2d ed. 1983)); *Heydon v. Mediaone of S.E. Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003) (relying on *Skelly Oil* in finding no subject matter jurisdiction over declaratory judgment action).  The Receivers suggest that therefore the district court should have looked to their subsequently-filed state complaint in the Mississippi litigation in determining whether, under the well-pleaded complaint rule, their causes of action arose under federal law.  At least one case from another circuit, however, suggests that the

proper inquiry is not into the complaint as subsequently filed, but instead whether the declaratory plaintiff "could reasonably have anticipated" a federal cause of action from the conduct of the other party. *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 78-79 (1st Cir. 1996). Under that formulation, the appropriate place to look is the correspondence and conversations between the Banks and the Receivers. Neither party addresses this point, however, and the record is relatively silent as to the character of the claims made on FTB by the Receivers, as opposed to their claims on AmSouth, who received a draft complaint.

Instead, FTB defends the district court's finding of subject matter jurisdiction entirely on the basis of the so-called "complete preemption" of Regulation J. Complete preemption is a narrow exception to the well-pleaded complaint rule, whereby plaintiff is master of his complaint and can choose to assert only state law claims, in situations where Congress has indicated an intent to occupy the field so completely that any ostensibly state law claim is in fact a federal claim for purposes of arising-under jurisdiction. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6-9 (2003). The Supreme Court has only found three statutes that evince this sort of Congressional intent: § 301 of the LMRA, *see Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists*, 390 U.S. 557, 560 (1968), § 502(a)(1)(B) of ERISA, *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-66 (1987), and §§ 85 and 86 of the National Bank Act, *see Beneficial Nat'l Bank*, 539 U.S. at 10-11. The district court, in finding that Regulation J might completely preempt the Receivers' state law claims,[4] characterized two Fourth Circuit opinions as

deciding the question in favor of complete preemption, namely *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223-24 (4th Cir. 2002), and *Donmar Enterprises, Inc. v. Southern National Bank*, 64 F.3d 944, 948-50 (4th Cir. 1995). These decisions, however, clearly deal with *ordinary* preemption, rather than the complete preemption that would justify original arising-under jurisdiction.

The district court erred in holding that Regulation J, a federal regulation promulgated by the Federal Reserve Board, a federal agency, could completely preempt the Receivers' state law claims; only Congress can completely preempt a state cause of action. *See Beneficial Nat'l Bank*, 539 U.S. at 8, 9 & n.5 (describing doctrine of complete preemption as when a "federal *statute* completely pre-empts the state-law cause of action"; "Only if *Congress* intended [the statute at issue] to provide the exclusive cause of action . . . would the *statute*" completely preempt state law claims; "[T]he proper inquiry focuses on whether *Congress* intended the federal cause of action to be exclusive." (emphases added)); *Metro. Life Ins.*, 481 U.S. at 66 (the touchstone of complete preemption is "the intent of *Congress*" (emphasis added)); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 468 n.11 (6th Cir. 2002)) ("Without evidence of *Congress*'s intent to transfer jurisdiction to federal courts, there is no basis for invoking federal judicial power." (emphasis added)); *Hyzer v. Cigna Prop. Cas. Ins. Co.*, 884 F. Supp. 1146, 1152 (E.D. Mich. 1995) (no support for contention that agency regulations could completely preempt area). This conclusion fits in more generally with the balance struck between an agency's ability to promulgate regulations with the force of federal law — and therefore its ability to preempt state causes of action through

---

[4] The district court specifically stated, "Thus, clearly federal questions are present here and the Court concludes that a federal scenario is presented in which Defendants' state law claims could be completely preempted by Regulation J." *First Tenn. Bank v. Dale*, No. 3:02-0683, slip op. at 28 (M.D. Tenn. Mar. 31, 2003), Joint Appendix No. 03-5521

("J.A. FTB") at 76. As the Receivers note, this formulation misunderstands the narrowly drawn nature of complete preemption and the necessity of looking to the character of the threatened action on its face in determining federal question jurisdiction in a declaratory action.

ordinary preemption — and its *inability* to create a right of action where Congress has not intended it do so. *See generally Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."); *Marx v. Centran Corp.*, 747 F.2d 1536, 1544 (6th Cir. 1984) ("It is plain that the [agency] is without authority [to create an implied cause of action]. The true question is whether Congress, in enacting [the enabling statute], intended to create a remedy for violations of [the regulation].") *cert. denied*, 471 U.S. 1125 (1985). While the agency can create federal law, it cannot expand federal jurisdiction.

Therefore, the proper inquiry in determining complete preemption is directed to the enabling statute, here the Federal Reserve Act, ch. 6, 38 Stat. 251 (1913) (codified as amended at 12 U.S.C. § 221 et seq.). The regulations in question govern wire transfers on Fedwire, the wire transfer system of the Federal Reserve Banks. The regulations were promulgated pursuant to the authority granted by four different sections of the Act: § 11(i) and (j) (12 U.S.C § 248(i) and (j)); § 13 (12 U.S.C. § 342); paragraph fourteen of § 16 (12 U.S.C. § 248(o)); and § 19(f) (12 U.S.C. § 464). None of these sections provide specific authority for the Fedwire system — instead, they are general provisions — and none of them reference causes of action having to do with the Federal Reserve system, or any of the markers associated with complete preemption. This argument is unavailing.

The district court also relied upon the Bank Secrecy Act ("BSA") in determining that federal jurisdiction existed, reasoning that "Defendants' factual allegations and claim implicate the BSA," and therefore, since the BSA did not create a private right of action, "FTB's complaint raises a federal question, if FTB's [presumably, should be Receivers'] claims are, in effect, asserting an implied right of action under the Bank Secrecy Act." *First Tenn. Bank v. Dale*, No. 3:02-

0683, slip op. at 28 (M.D. Tenn. Mar. 21, 2003), Joint Appendix No. 03-5521 ("J.A. FTB") at 76. The court then stated, "To the extent that Plaintiff's complaint raises this issue, clearly this is a legal question that gives rise to federal jurisdiction." J.A. FTB at 76 (Mem. Op. at 28). These statements mischaracterize the nature of the inquiry under the well-pleaded complaint rule and the *Skelly Oil* rule: the question to be asked is whether, under the hypothetical state-law action of the Receivers, a well-pleaded federal question would appear on the face of the complaint. This question must be answered in the negative under *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 807-12 (1986), in which the Court held that where a federal statute does not create a private right of action, mere incorporation of federal statutory standards into a state-law tort action cannot create federal question jurisdiction. Because the Bank Secrecy Act does not create a private right of action, the Receivers' incorporation of its standards into a state-law cause of action cannot transform their complaint into one that raises a federal question.

FTB argues on appeal that as Flowers, the only non-diverse defendant, has been dismissed from the case, diversity subject matter jurisdiction now exists. Although normally jurisdiction depends upon the facts as they are at the time of filing, curing a jurisdictional defect through dismissal of a party that destroys diversity "ha[s] long been an exception to the time-of-filing rule." *Grupo Dataflux v. Atlas Global Group, L.P.,* No. 02-1689, 541 U.S. ___, slip op. at 3-4, 5 (2004). This dismissal can be effected by the district court, even subsequent to adjudication on the merits, and even by an appellate court. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 836-38 (1989).

The Receivers make three arguments in an attempt to distinguish the instant case from this clear precedent. They first argue that under the authority of *United States Fidelity & Guaranty Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1087

(6th Cir. 1992), the district court never had jurisdiction over the case, and therefore its order dismissing Flowers is void. This argument is unavailing; the court in *United States Fidelity* came to the ultimate conclusion that jurisdiction was lacking, whereas in cases where a post-filing jurisdiction cure is allowed, all intermediate decisions are rendered not void for lack of jurisdiction. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73-77 (1996). Next, the Receivers attempt to distinguish the clear holdings of *Caterpillar* and *Newman-Green*.[5] With respect to *Newman-Green*, they emphasize that *Newman-Green* was a Rule 21 case, and that Flowers was dismissed pursuant to Rule 41. The Receivers further argue that Rule 21 permits dismissal only of non-indispensable parties, and that because Flowers was a plaintiff in the Mississippi litigation, she was therefore indispensable. While it is unclear from the record pursuant to which Rule Flowers was dismissed, although we note that we have in the past indicated that dismissal of a party, rather than of an entire action, is more proper pursuant to Rule 21, *see Letherer v. Alger Group, L.L.C.*, 328 F.3d 262, 265-66 (6th Cir. 2003), we conclude that the particular rule used is immaterial in assessing whether jurisdiction was created by a party's dismissal. S*ee Safeco Ins. Co. v. City of White House, Tenn.*, 36 F.3d 540, 546 (6th Cir. 1994) (either Rule 15 or Rule 21 can provide mechanism for post-filing jurisdiction cure). The Receivers then note that the Court in *Newman-Green* and *Caterpillar* relied on practical considerations of less weight here: "considerations of finality, efficiency, and economy,"

---

**5***Faysound Ltd. v. United Coconut Chemicals, Inc.*, 878 F.2d 290, 296 (9th Cir. 1989), cited by the Receivers for the proposition that a post-filing dismissal of parties cannot confer diversity jurisdiction, is something of an outlier. It can perhaps be best explained by a rule that once the district court properly decides it has no jurisdiction at a time when all non-diverse parties are indispensable, actions subsequent to that decision aimed at making those parties dismissable cannot confer jurisdiction.

*Caterpillar*, 519 U.S. at 75, that arise only after trial is completed.

We are reluctant to expand this narrow exception to the time-of-filing rule (the post-filing jurisdiction cure through dismissal of a party) in light of *Grupo Dataflux*'s rejection of an expansion of the exception to a change in citizenship of a partnership based on individuals leaving the association. However, we also take note of the *Grupo Dataflux* Court's characterization of the dismissal of a non-diverse party as an "established exception" to the time-of-filing rule. Slip op. at 6. What is most disturbing in this case is not the particular rule pursuant to which Flowers was dismissed, or the extent of the litigation activity which has transpired before the jurisdictional defect is noticed and/or corrected, but instead that jurisdiction in the district court was alleged to be federal question jurisdiction. The more difficult question is not whether Flowers's dismissal is the equivalent of those in *Caterpillar* or *Newman-Green* but whether the original defective allegation of federal question can be corrected by a subsequent happenstance creation of diversity jurisdiction.

In *Grupo Dataflux* and *Caterpillar*, the Court indicated that the cure of jurisdiction accomplished by the dismissal of a nondiverse party can also serve to cure the statutory defect existing where a case is removed at a time when it is not in the original jurisdiction of the district courts of the United States within the meaning of 28 U.S.C. § 1441(a). *Grupo Dataflux*, slip op. at 7. The district court now has jurisdiction over FTB's action based on diversity of citizenship; the question is whether the prior defects are the sort that are remedied by the post-filing jurisdiction cures of *Caterpillar* and *Newman-Green*. Two distinctions may serve to oust jurisdiction here: first, the prior defect is different in kind, as jurisdiction was not originally alleged on the basis of diversity, and second, the jurisdictional defect was noticed early (and often) and the action had not proceeded to judgment at the time of this appeal.

Title 28 U.S.C. § 1653 provides, "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."  Relying upon this section, courts have often reached beyond the specific statutory sections cited by the complaint to reach a different basis for jurisdiction — albeit one that exists on the face of that complaint. *See, e.g., LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.*) 196 F.3d 1, 5 (1st Cir. 1999) ("Affirmative pleading of the precise statutory basis for federal subject matter jurisdiction is not required as long as a complaint alleges sufficient facts to establish jurisdiction."), *cert. denied,* 530 U.S. 1230 (2000); *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1515 (9th Cir. 1987) ("[I]n determining the existence of subject matter jurisdiction, we are not limited to the jurisdictional statutes identified in the complaint."); *Vukonich v. Civil Serv. Comm'n,* 589 F.2d 494, 496 n.1 (10th Cir. 1978) ("The failure to alleged this alternate basis for jurisdiction is not fatal where the complaint revealed a basis for § 1331 jurisdiction."); *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir. 1978) ("[I]t is not essential that a complainant set forth the statutory basis for the court's jurisdiction in order for the court to assume jurisdiction, if the facts alleged provide a basis for the assumption of jurisdiction.").  Of particular interest in this line are two Sixth Circuit cases allowing amendment of a complaint to change the asserted basis of jurisdiction from federal question to diversity and vice versa.  In *Miller v. Davis*, 507 F.2d 308, 311 (6th Cir. 1974), although the complaint's allegation of federal question jurisdiction was deficient, "It appears, however, that [diversity] jurisdiction could have been alleged . . . . Appellants are most probably citizens of Kentucky . . . , Appellees are not Kentucky citizens, and the Fund is situated in the District of Columbia."  Relying on 28 U.S.C. § 1653, the court proceeded to the merits of the appeal but directed the appellants to "file, within ten days of this decision, a proper amendment *in this Court* alleging diversity jurisdiction."  507 F.2d at 311 (emphasis added).  Two aspects of *Miller* stand out:  first, diversity jurisdiction was

not "apparent" on the face of the complaint, as evidenced by this court's hesitant language ("could have been alleged," "most probably"); second, we allowed an amended complaint to be filed in the Sixth Circuit itself, suggesting that the *Newman-Green* rule should extend to reach a case like this one.  In an earlier case, *Blanchard v. Terry & Wright, Inc.*, 331 F.2d 467, 468-69 (6th Cir.), *cert. denied*, 379 U.S. 831 (1964), this court held that although the diversity jurisdiction alleged on the face of the complaint was not present, the factual allegations in the complaint were sufficient to confer federal question jurisdiction.  "Even though the allegations of the original complaint with respect to jurisdiction of the court were defective, the trial or appellate court had full power to correct them." *Id.* at 469.  In the case at bar, the district court has jurisdiction over the case under *Caterpillar* and *Newman-Green*, as all parties are now diverse.  The antecedent defective allegations of jurisdiction should not serve, following these cases, to defeat this general rule.

Because we decide that this action should be dismissed because it is an inappropriate declaratory action, we do not need to decide whether, when such a jurisdictional defect is raised in an interlocutory appeal, we have discretion to disallow a post-filing jurisdiction cure, or, if we do have such discretion, if we should exercise it in such a situation. Instead, we hold subject matter jurisdiction exists and exercise it for the limited purpose of remanding this action for dismissal with prejudice.

## C.  McCarran-Ferguson Act and *Burford* Abstention

In their AmSouth appeal, the Receivers argue that McCarran-Ferguson Act reverse preemption and *Burford* abstention form independent grounds for the district court to have found it lacked jurisdiction.  The district court did not address the McCarran-Ferguson Act argument, but it was raised by the Receivers below.  Reviewing the lines of cases cited by the parties, it becomes clear that often when faced

with suit in the federal courts, a state commissioner of insurance as receiver or liquidator of an insurance company placed under the state's care will rely on one or both of these doctrines to attempt to defeat federal court jurisdiction. Because state liquidation proceedings of insolvent insurers are exactly the sort of intricate state regulation on behalf of state-resident policyholders that these doctrines are intended to protect, these arguments have some force when angry creditors attempt to sue insolvent insurance companies in federal court to jump ahead in the queue of claims, but they have less force here, where the insurance companies are themselves the natural plaintiffs, as Receivers vociferously argue. This dispute involves the Receivers' attempt to recover money in an ordinary common-law-damages suit; the Banks do not here attempt to disrupt a coherent state scheme in favor of enriching their own pockets.

First, the Receivers claim that the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance," reverse-preempts the Declaratory Judgment Act in this case. They argue that if the Declaratory Judgment Act allows this action against them, it impairs the operation of state laws providing for the liquidation of insurance companies, including those providing for antisuit injunctions. Antisuit injunctions were issued as part of the liquidation proceedings for each of the insolvent insurance companies controlled by the Receivers. *See, e.g., Tenn. ex rel. Sizemore v. Franklin Am. Life Ins. Co.*, No. 99-1326-II (Tenn. Ch. Oct. 25, 1999) (Consent Final Order of Liquidation; Finding of Insolvency; and Permanent Injunction, at 4) ("[N]o action at law or equity or in arbitration shall be brought against the insurer or liquidator."), J.A. FTB at 812, 815. Those injunctions bar suits against the insurance companies in any court; both parties agree on appeal that the injunctions of their own force cannot limit

federal judicial power, but the Receivers argue that McCarran-Ferguson gives them that power.

McCarran-Ferguson reverse preemption depends upon the policies that undergird state law. Where a state law protects state insurance-policyholders, it is a "law enacted . . . for the purpose of regulating the business of insurance"; when it protects other interests, for instance, those of stockholders in those insurance companies, it is not such a law within the meaning of the Act. *See SEC v. Nat'l Sec. Inc.*, 393 U.S. 453, 457 (1969). The connection to the protection of policyholders cannot be too attenuated; in *United States Department of the Treasury v. Fabe*, 508 U.S. 491, 508 (1993), in the course of finding that an Ohio insurer-liquidation statute providing for a creditor-preference order contrary to general federal law reverse-preempted the federal law to the extent it privileged policyholders and the administration of the system in furtherance of the privilege of policyholders, the Court noted the difficulty.

> Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: "But in that sense, every business decision made by an insurance company has some impact on its reliability . . . and its status as a reliable insurer." [*Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 216-17 (1979)]. *Royal Drug* rejected the notion that such indirect effects are sufficient for a state law to avoid pre-emption under the McCarran-Ferguson Act.

*Fabe*, 508 U.S. at 508-09. Finally, when assessing whether a general federal statute that creates a cause of action "impairs" the operation of a state law, the proper inquiry is whether the particular suit being brought would impair state law. *See Humana Inc. v. Forsyth*, 525 U.S. 299, 311, 313 (1999) (analyzing effect of McCarran-Ferguson Act on RICO

suit with respect to particular suit, rather than only general operation of statute).

This court has previously rejected a claim that an Ohio law, Ohio Rev. Code § 3927.05, requiring the insurance commissioner to revoke the license of any foreign insurance company that removes an action initiated by a citizen of Ohio to federal court, was saved from its otherwise conceded unconstitutionality by the operation of the McCarran-Ferguson Act. *See Int'l Ins. Co. v. Duryee*, 96 F.3d 837, 838-40 (6th Cir. 1996). The question in that case boiled down to whether the statute was "aimed at protecting or regulating the performance of an insurance contract," the standard announced in *Fabe*, 508 U.S. at 505 (internal quotation marks omitted). We held it was not, noting that whether litigation itself could be integral to that performance, the choice of forum was not; that unlike the statute at issue in *Fabe*, § 3927.05 did not increase the substantive rights of policyholders, but was in fact not limited to policyholders; and that the reach of the statute was not confined to policy disputes. Finding the statute "not enacted so much 'for the purpose of regulating the business of insurance' as for the parochial purpose of regulating a foreign insurer's choice of forum," *Duryee*, 96 F.3d at 840, we concluded that the statute was not within McCarran-Ferguson's sweep.

Two cases cited by the Receivers concluded that McCarran-Ferguson reverse preemption protects state insurer-liquidation courts' antisuit injunctions. In *Munich American Reinsurance Co. v. Crawford*, 141 F.3d 585, 590-96 (5th Cir.), *cert. denied,* 525 U.S. 1016 (1998), the Fifth Circuit faced the question of whether Oklahoma's antisuit injunctions, part of its Uniform Insurers Liquidation Act (the "OUILA"), were protected by McCarran-Ferguson such that they preempted the Federal Arbitration Act and the insolvent insurance company could not be compelled to enter arbitration. Deciding that the OUILA as a whole and its antisuit provisions in particular were enacted for the purpose of

regulating the business of insurance, the court went on to conclude that ordering the reinsurers' action "resolved in a forum other than the receivership court nevertheless conflicts with the Oklahoma law giving the state court the power to enjoin any action interfering with the delinquency proceedings." *Id.* at 595. The court did note that "the precise degree to which a state statute may be impaired so as to trigger the McCarran-Ferguson Act is not well-settled," but found "impairment sufficient to trigger it" there. *Id.* Following *Munich American*, the Tenth Circuit in *Davister Corp. v. United Republic Life Insurance Co.*, 152 F.3d 1277, 1280-82 (10th Cir. 1998), *cert. denied,* 525 U.S. 1177 (1999), held similarly that the Federal Arbitration Act was reverse-preempted by the Utah statute "consolidating all claims against a liquidating insurer." An earlier Second Circuit case, not cited by the Receivers, reaches a similar conclusion with respect to the effect on the Federal Arbitration Act of the Kentucky Insurers Rehabilitation and Liquidation Law, which contains an anti-arbitration clause. *See Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41, 43-45 (2d Cir. 1995). Finally, the Receivers cite *Covington v. Sun Life of Canada (U.S.) Holdings, Inc.*, No. C-2-00-069, 2000 WL 33964592, *3-*10 (S.D. Ohio May 17, 2000), which held that the federal removal and diversity jurisdiction provisions were reverse-preempted by Ohio law granting exclusive jurisdiction in liquidation-related legal matters to the Franklin County Court of Common Pleas.

On the other side is a different line of cases refusing to find reverse preemption. In *Gross v. Weingarten*, 217 F.3d 208, 222-23 (4th Cir. 2000), the court rested its holding, after treating critically *Munich American* and its progeny, on the conclusion that "concurrent federal jurisdiction over the defendants' counterclaims [does not] threaten[] to 'invalidate, impair, or supersede'. . . . Virginia's efforts to establish a single equitable proceeding to liquidate or rehabilitate insolvent insurers." *Id.* at 222 (citing *Humana*, 525 U.S. at 307-10). This conclusion was dependent on the facts of the

particular case before it, but the court also indicated that the sort of interference contemplated by the parties in that case could be dealt with through abstention doctrines. In *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 160-62 (3d Cir. 2000), the court, assuming the "enacted for the purpose" prong, found no impairment on the facts of the case, where the proceeding was "a suit instituted by the Liquidator against a reinsurer to enforce contract rights for an insolvent insurer, which, if meritorious, will benefit the insurer's estate." In *Grode v. Mutual Fire, Marine and Inland Insurance Co.*, 8 F.3d 953, 960 (3d Cir. 1993), the court tersely rejected the McCarran-Ferguson Act argument made by the Insurance Commissioner, noting that the "action instituted by the Commissioner in this case has nothing to do with Pennsylvania's regulation of insurance." And in *Nichols v. Vesta Fire Insurance Corp.*, 56 F. Supp. 2d 778, 780 (E.D. Ky. 1999), the court concluded that under the Kentucky law the action it had before it — "a common law breach of contract action which merely happens to involve an insolvent insurer" — was not subject to the exclusive jurisdiction of the liquidation court.

Where the insolvent insurer is itself a plaintiff in an ordinary contract or tort action, courts tend to look unfavorably on claims of McCarran-Ferguson preemption of the FAA or the removal statutes so as to insulate that action from the federal courts. That seems to be motivated as much by frustration over the attempts by parties to evade federal jurisdiction as by reasoned doctrinal analysis, but one way to cast it in a favorable doctrinal light is to extend the rule of *Humana* — that impairment must be defined with respect to the particular cause of action — to the question of purpose. That is, an ordinary suit against a tortfeasor by an insolvent insurance company implicates a "regulation of the business of insurance" only in the attenuated fashion rejected in *Fabe*; an antisuit injunction would only be a regulation of the business of insurance to the extent it protected the assets of the insurance company from suit. Here, of course, the Banks seek only declaratory judgment, based in turn on a threatened ordinary common-law action against them, and the assets of the insurance companies are up for grabs only in that attenuated fashion. A second wrinkle is the narrow or broad definition of "impair": in *Munich American*, impairment was defined ultimately quite broadly, in that any suit which was in violation of the antisuit provision would have impaired that provision. The *Gross* court, looking to the purpose of the antisuit provision, held that impairment does not occur unless the integrity of the core liquidation proceedings is attacked. Here those core proceedings are not implicated. Ultimately, we conclude that it would be an overly expansive reading of the case law and the purposes of the doctrine to find McCarran-Ferguson reverse preemption here. The threatened declaratory judgment actions against insolvent insurance companies for the purpose of evading liability in a threatened common-law coercive action by the insurance companies have only an attenuated connection to regulating the business of insurance.

*Burford* abstention is similarly inapplicable here. First invoked in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), *Burford* abstention requires a federal court to abstain from jurisdiction where to assume jurisdiction would "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976). But *Burford* "does not require abstention whenever there exists [a complex state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362 (1989) (quoting *Colo. River*, 424 U.S. at 815-16). Instead, "This balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (quotation omitted). State liquidation

proceedings seem like an excellent candidate for *Burford* abstention, but it is difficult to see how a federal court's pronouncement on issues of common-law liability having nothing to do with insurance could be disruptive of those proceedings. Like under the McCarran-Ferguson analysis, that Receivers are covered by the antisuit provisions of the various liquidation laws seems mere coincidence, and abstention seems inappropriate. The cases cited by the Receivers are all distinguishable.

*Gonzalez v. Media Elements, Inc.*, 946 F.2d 157, 157 (1st Cir. 1991), involved a dispute over coverage with a solvent insurer that apparently became insolvent on appeal. A coverage claim against a now-insolvent insurer that arose prior to the insolvency is of course exactly the sort of claim that must be heard in the liquidation proceedings; although dismissal under *Burford* abstention is no longer appropriate under *Quackenbush* in damages actions, presumably McCarran-Ferguson protection would extend to this kind of claim. The court in *Martin Insurance Agency, Inc. v. Prudential Reinsurance Co.*, 910 F.2d 249, 254-55 (5th Cir. 1990), predicated its decision that *Burford* abstention was appropriate where the "claims involve what are, on their face, assets of [the insolvent insurance company] owned solely by the receiver." And while *Grimes v. Crown Life Insurance Co.*, 857 F.2d 699 (10th Cir. 1988), does involve a receiver-instituted suit, the subject matter of the suit was recovering money damages from another insurance company based on a coverage dispute. The "appeal center[ed] on the interpretation of certain provisions contained in the [reinsurance] Agreement [and] the effect of the interpretation of the Agreement by the Oklahoma Commissioner of Insurance." *Id.* at 700. Because *Burford* abstention is concerned with potential disruption of a state administrative scheme, rather than the mere existence of such a scheme, looking behind the action to determine whether it implicates the concerns of *Burford* is necessary, and the issues in this litigation, concerning the liability of the Banks for various

non-insurance-related activities, federal law defenses, and state tort law, do not warrant *Burford* abstention. The district court thus did not abuse its discretion in refusing to abstain under *Burford*.

## D.  Appropriateness of Declarative Relief

"This court reviews the district court's exercise of discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for abuse of discretion." *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967 (6th Cir. 2000). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). The Declaratory Judgment Act is "'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Id.* at 287 (quoting *Wycoff*, 344 U.S. at 241). "'[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power.'" *Id.* (quoting *Wycoff*, 344 U.S. at 243). These concerns are heightened where, as in *Wilton*, there are pending state-court proceedings representing the same issues of state law; "a district court might be indulging in 'gratuitous interference' if it permitted the federal declaratory action to proceed." *Id.* at 283 (quoting *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942)) (alteration in original) (citations omitted). This case represents an interesting conundrum in that at the time the motion to dismiss was filed, the Mississippi litigation was in state court; when the Tennessee district court's injunctive order was entered, the Mississippi litigation had been, possibly incorrectly, removed to the federal district court for the Southern District of Mississippi; but now, the Mississippi litigation is likely correctly in federal court under *Caterpillar*, as the incorrect removal can be cured by the subsequent creation of jurisdiction. Had the Tennessee

district court ruled immediately on the Receivers' motion, the district court would also have been bound by the Anti-Injunction Act, 28 U.S.C. § 2283, and cases interpreting it to dismiss the Banks' complaint, as the Banks pray for injunctive relief against the prosecution of state-court proceedings (the Mississippi litigation) instituted before decision in the Tennessee district court and seek a declaratory judgment which will have the same practical effect. *See Martingale LLC v. City of Louisville*, 361 F.3d 297, 303 (6th Cir. 2004); *Tropf v. Fidelity Nat'l Title Ins. Co.*, 289 F.3d 929, 941-42 (6th Cir. 2002), *cert. denied,* 537 U.S. 1118 (2003). While the Anti-Injunction Act does not by its terms apply now, where the Mississippi litigation will likely take place in federal court, that it did apply at the time the motion to dismiss the Tennessee litigation was filed, and would have applied at the time of the district court's decision below but for a potentially erroneous removal of the Mississippi litigation by AmSouth, is extremely disturbing. In determining the propriety of entertaining a declaratory judgment action, competing state and federal interests weigh in the balance, with courts particularly reluctant to entertain federal declaratory judgment actions premised on diversity jurisdiction in the face of a subsequently-filed state-court coercive action. These background concerns — that even if the Banks acted in good faith, the ultimate outcome of their procedural behavior has been to wrest this case away from the state courts — should come into play in assessing the appropriateness of assuming jurisdiction over these claims.

This court has adopted a five-factor test to determine when a district court should exercise jurisdiction over a declaratory judgment:

(1) whether the judgment would settle the controversy;
(2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
(5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co.*, 211 F.3d at 968. The district court noted this test, but did not apply each factor, instead deciding that the pendency of a related state action did not necessarily bar a federal declaratory-judgment action, finding that the Banks had not engaged in procedural fencing, and finding that "Tennessee is a logical forum for this dispute." J.A. FTB at 64 (Mem. Op. at 16). Because we find clear error in certain of the district court's factual findings, and misapplication of legal standards, we conclude that the district court abused its discretion in assuming jurisdiction over these declaratory actions.

**1. Whether the Judgment Would Settle the Controversy?**

The district court did not consider this factor in its analysis, but the parties dispute on appeal whether it weighs in favor of entertaining the actions or dismissing them. The crux of the argument between the parties is whether or not the ability of the Receivers to file counterclaims that will dispose of all issues in the declaratory-judgment actions can be considered in determining whether the judgments would settle the controversy. Each side argues that the rule the other proposes will swallow this factor, as counterclaims will so often be possible or even compulsory that all declaratory judgments will either be able to or not be able to settle the controversy. We conclude only that in this case, this first factor does not weigh heavily in favor of or against allowing these actions.

## 2. Whether the Declaratory Judgment Action Would Serve a Useful Purpose in Clarifying the Legal Relations at Issue?

This factor weighs heavily in favor of dismissing the declaratory judgment suit. The only "useful purpose" these declaratory-judgment actions could serve is an ultimate determination of liability on an already-accrued damages claim. Its usefulness is therefore severely undercut by the presence of the Mississippi litigation. This is not a situation in which a declaratory plaintiff will suffer injury unless legal relations are clarified; the Banks do not currently "act at their peril." *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749-50 (7th Cir. 1987) (where declaratory defendant "promptly filed suit to enforce its [underlying] claim . . . a declaratory judgment would serve no useful purpose and was properly denied").

Normally, when a putative tortfeasor sues an injured party for a declaration of nonliability, courts will decline to hear the action in favor of a subsequently-filed coercive action by the "natural plaintiff." *See* 10B WRIGHT, MILLER & KANE § 2765 at 638 (3d ed. 1998) ("The courts have also held that it is not one of the purposes of the declaratory judgments act to enable a prospective negligence action defendant to obtain a declaration of nonliability."). This general rule is subject to exception when some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory plaintiff in the meantime. That is, a party who wants, for example, to embark on a marketing campaign, but has been threatened with suit over trademark infringement, can go to court under the Declaratory Judgment Act and seek a judgment that it is not infringing that trademark, thereby allowing it to proceed without the fear of incurring further loss. Similarly, a party with an ongoing contractual relationship who has been accused of breach can go to court and have the contract definitively interpreted, thus allowing it to conform its behavior to the law and stop the potential accrual of damages.

The "useful purpose" served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing. Here, the Banks incurred no further loss while settlement negotiations continued, and at the time they filed, even the "uncertainty" of awaiting suit on past behavior would have extended less than two weeks, from the filing dates of July 18 and 19 to the end of the tolling period on July 31. While AmSouth describes the two-year settlement negotiations as a "danse macabre" in which a "Damoclean sword hung over its head," all AmSouth ever had to do to stop this "danse macabre" was to refuse to renew the tolling agreement or to cease settlement negotiations, at which time, if the Receivers did not file suit promptly, a declaratory suit may have been appropriate. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002) ("[T]he threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment."); *Int'l Ass'n of Entrepreneurs v. Angoff*, 58 F.3d 1266, 1270 (8th Cir. 1995) ("[T]he Declaratory Judgment Act is not to be used to bring to the federal courts an affirmative defense which can be asserted in a pending state action."), *cert. denied*, 516 U.S. 1072 (1996); *Morrison v. Parker*, 90 F. Supp. 2d 876, 881 (W.D. Mich. 2000) ("Viewed from the perspective of [the Sixth Circuit's five] standards, an action by a putative tortfeasor fares poorly as a declaratory judgment action."); *Plough, Inc. v. Allergan, Inc.*, 741 F. Supp. 144, 147-48 (W.D. Tenn. 1990) (in Lanham Act case, where declaratory plaintiff was under threat of suit for ongoing marketing activities, declaratory judgment appropriate).

The district court characterized the settlement negotiations engaged in by FTB and the Receivers as "'continuous[] accus[ations]'" for "at least several months before FTB brought this suit 'to secure an adjudication of its rights.'" J.A. FTB at 63 (Mem. Op. at 15). The district court relied on *Eli's Chicago Finest, Inc. v. Cheesecake Factory, Inc.*, 23 F. Supp. 2d 906, 908 (N.D. Ill. 1998), for the point that

continuous accusations without adjudication of rights can justify entertaining a declaratory judgment suit. But as demonstrated by *Eli's Chicago Finest*, in which a single cease-and-desist letter was held not to constitute continuous accusations, the factual circumstances surrounding those accusations are dispositive. First, as the Receivers point out, it is unclear what "two demands" the district court was referring to in finding "continuous accusations"; the Receivers made no formal demands to FTB, only an oral indication that they intended to assert claims if they could not be resolved through negotiation. FTB had signed a tolling agreement, indicating some willingness to negotiate a settlement rather than forcing a legal action, had engaged in preliminary negotiations, and had in fact *asked for a formal settlement demand* that was being prepared as it filed suit. This is clearly not the case of the plaintiff who accuses continuously but does not file, but instead the case of the defendant who races to the courthouse while at the same time assuring the plaintiff that the defendant is still interested in at least discussing settlement options. The district court clearly erred in these historical findings of fact.

FTB also argues on appeal that many of the claims advanced by the Receivers are not torts, but instead contract claims, and therefore, FTB does not fit into the category of "putative tortfeasor." At most, this can only undermine reliance on those cases that rely on that particular formulation of the type of declaratory plaintiff at issue here. In any case, it is irrelevant to the policy considerations that underly the doctrine: Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified. This is true whatever the nature of the coercive action underlying the declaratory action — the important distinction in the case law is between situations where some uncertainty beyond the possibility of litigation exists (i.e.,

trademark infringement) and those where the injury is already complete. Contract claims can sometimes fall into the first category because of the ongoing nature of a contractual relationship, whereas tort claims will often fall into the second because they are dependent on historical occurrences rather than ongoing conditions. All of the claims extended by the Receivers fall into the second category, in that they allege no present or continual wrongdoing on the part of the Banks that would require immediate clarification of the parties' respective rights. While the Banks might have a continuing contractual relationship with the insurance companies and the Receivers, the historical incidents giving rise to liability are finished. Ultimately, this factor weighs heavily against the exercise of jurisdiction over these declaratory actions, where a pending coercive action exists.

**3.   Whether the Declaratory Remedy is Being Used Merely for the Purpose of Procedural Fencing or to Provide an Arena for a Race for Res Judicata?**

Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a "natural plaintiff" and who seem to have done so for the purpose of acquiring a favorable forum. Allowing declaratory actions in these situations can deter settlement negotiations and encourage races to the courthouse, as potential plaintiffs must file before approaching defendants for settlement negotiations, under pain of a declaratory suit. This also dovetails with the previous factor: where a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum — a guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act. *See Hyatt Int'l*, 302 F.3d at 712 (the Act "is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse."

(internal quotation marks omitted)); *NGS Am., Inc. v. Jefferson*, 218 F.3d 519, 523 (6th Cir. 2000) ("[A] rule permitting [this sort of declaratory] action could frustrate a plaintiff's choice of forum and encourage forum shopping, races to the courthouse, needless litigation occasioning waste of judicial resources, delay in the resolution of controversies, and misuse of judicial process to harass an opponent in litigation," irrespective of the actual motives of the declaratory plaintiff); *BASF Corp. v. Symington*, 50 F.3d 555, 558-59 (8th Cir. 1995) ("declaratory actions founded exclusively on a defense to a state law claim should be dismissed as a tactical maneuver calculated to deny potential plaintiffs of their traditional right to choose the forum and time of suit"; "the natural plaintiff's choice of forum and law will be disturbed only in exceptional circumstances"); *Tempco*, 819 F.2d at 750 ("[T]he federal declaratory judgment is not a prize to the winner of the race to the courthouse." (internal quotation marks omitted)); *UAW v. Dana Corp.*, No. 3:99CV7603, 1999 WL 33237054, *5-*6 (N. D. Ohio Dec. 6, 1999) (where declaratory plaintiff filed suit in order to "preempt the choice of forum that otherwise would be for the union to make," declaratory judgment inappropriate; noting "a presumption that a first filed declaratory judgment action should be dismissed or stayed in favor of the substantive suit," and that at the least, "the declaratory judgment plaintiff should have the burden or showing persuasive cause why its suit should not be enjoined").

The district court found "that this declaratory judgment action[6] was not filed in Tennessee for procedural fencing."

---

[6] The district court issued a memorandum decision in FTB's action against the receivers making findings only as to FTB's action, but then denied the Receivers' motion to dismiss in the AmSouth action "[f]or the reasons stated in the *First Tennessee* action." *AmSouth Bank v. Dale*, No. 3:02-0677 (M.D. Tenn. Mar. 31, 2003) (order denying motion to dismiss

J.A. FTB at 65 (Mem. Op. at 17). We conclude that the factual determination underlying this finding was clearly erroneous, as were the legal standards used to reach this conclusion. The district court first found that the Receivers had continuously accused FTB for several months before FTB's action was brought to secure an adjudication of its rights; then that Tennessee was a logical forum for this dispute; and finally that a controversy was presented by the Receivers' threat of suit. Taking up this last conclusion first, we note that the presence of a controversy is a prerequisite for the district court's initial power to hear a declaratory judgment action; its absence strips the district court of jurisdiction, and its presence therefore should have no weight in determining whether a declaratory-judgment action is appropriate. Next, whether the forum chosen by the declaratory plaintiff is "logical" can have only a minimal value in determining whether procedural fencing has occurred.[7] The question is not which party has chosen the

---

and granting injunction), Joint Appendix No. 03-5517 ("J.A. AmSouth") at 42. We find it to be clear on the record that AmSouth engaged in procedural fencing, and therefore we do not need to remand for separate factual findings to evaluate the propriety of each of these actions.

[7] It is unclear whether the propriety of Tennessee as a forum was weighed by the district court as part of the "procedural fencing" analysis, or as a separate factor in determining whether the declaratory judgment was appropriate. The parties vigorously contest whether the district court appropriately considered the logic of the forum. The Receivers cite *Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912, 916 (N.D. Ind. 2000) ("[R]egardless of whether Indiana is the more appropriate venue . . . it is inappropriate for the Plaintiffs to file for a declaratory judgment for the purposes of forum-shopping.") and *UAW v. Dana Corp.*, No. 3:99CV7603, 1999 WL 33237054, *4 (N. D. Ohio Dec. 6, 1999) (differentiating proper forum selection, where a "plaintiff seeking redress for a cognizable injury is entitled" to choose among appropriate forums, from improper forum shopping, where a party "manipulate[s] procedural devices to secure an advantage which, were those devices not available, it could not employ to defeat its opponent's choice of forum"). AmSouth relies on *United States Fire Insurance Co. v. Goodyear Tire & Rubber*

better forum, but whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first. That a particular forum is better or worse is irrelevant in answering that factual question.

Instead, we conclude that a review of the factual record leads to the unavoidable conclusion that procedural fencing has occurred. The Receivers, alerted to the possibility of claims against the Banks in the course of litigation against other parties, notified the Banks of their exploration of those claims and initiated settlement negotiations. The Banks indicated their willingness to consider settlement, most notably by signing a number of tolling agreements, and in AmSouth's case, through correspondence indicating that those negotiations were ongoing. FTB requested a settlement demand, and while that demand was being prepared, filed this action. Just one day before filing its declaratory action, AmSouth's counsel sent a letter stating that AmSouth was "still considering" the Receivers' demand and its options, and that counsel would "be in touch in the near future concerning a written response and a possible meeting on July 24." J.A. AmS at 572. It seems clear that the Banks filed declaratory

actions not to resolve issues of liability that were hindering their normal behavior, but instead to gain procedural advantage. *See Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, No. 00-3183, 2001 WL 897452, *4 (6th Cir. July 31, 2001) (where declaratory plaintiffs filed suit after requesting extension to respond to settlement demand, one day before extension's expiration, a "finding of bad faith is overwhelmingly supported in the record"); *Nortek, Inc. v. Molnar*, 36 F. Supp. 2d 63, 70 (D.R.I. 1999) (where declaratory plaintiff asked for letter outlining legal reasoning and promised to respond, then filed action prior to responding to letter, party "certainly shopped for a forum," and court therefore declined jurisdiction over first-filed action); *Columbia Pictures Indus., Inc. v. Schneider*, 435 F. Supp. 742, 747-48 (S.D.N.Y. 1977) (allowing six-days-earlier declaratory action to proceed "would create disincentives to responsible litigation," and instead, "Potential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before plaintiff files an already drafted complaint."). *Cf. N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 647 (7th Cir. 1998) (where settlement negotiations had reached acknowledged impasse, declaratory judgment filed one month after last contact between parties was not "racing to the courthouse"); *Kmart Corp. v. Key Indus., Inc.*, 877 F. Supp. 1048, 1052-55 (E.D. Mich. 1994) (finding declaratory judgment appropriate; key consideration is whether the declaratory plaintiff "misled the defendant into believing that their dispute could be resolved amicably so that the plaintiff could win the race to the courthouse").

We conclude that the practical effect of FTB's and AmSouth's participation in settlement negotiations and affirmative representations of that participation was to lull the Receivers into believing that amicable negotiation was still possible, and that the filing of these declaratory actions was

---

*Co.*, 920 F.2d 487, 489 n.7 (8th Cir. 1990) (footnote remarking as an aside to rejecting the declaratory defendant's claims of procedural fencing that the dispute was one over a Minnesota judgment and involved a Minnesota accident); *Telephonics Corp. v. Lindly & Co.*, 291 F.2d 445, 446-47 (2d Cir. 1961) (in weighing propriety of an antisuit injunction entered by district court in declaratory action, noting that New York was a more appropriate venue for the suit); and *DP-Tek, Inc. v. Villalobos*, 809 F. Supp. 811, 813 (D. Kan. 1992) (using traditional forum selection factors in weighing appropriateness of declaratory action). Whether or not the district court's consideration of this factor was incorrect, given that both parties have a reasonable claim to their respective forum, this factor is something of a wash, and we decline to decide whether a district court is always precluded from considering it. To the extent it may weigh in favor of the declaratory action, the other factors — explicitly required by prior circuit case law — still weigh heavily in favor of the Mississippi litigation.

an effort to engage in procedural fencing to secure the Banks' choice of forum. The district court clearly erred in concluding otherwise. This factor weighs heavily against entertaining these actions under the Declaratory Judgment Act.

### 4.   Whether allowing the action would cause friction between state and federal courts?

This is a factor that, as noted above, would have at the outset of this litigation been dispositive under the Anti-Injunction Act, and before the dismissal of Flowers from the suit weighed heavily against entertaining this action in favor of allowing the Mississippi litigation to proceed. It seems unfortunate that happenstance and procedural maneuvering by the Banks should serve to undercut this particularly important factor in the balance, but at this point it is difficult to say that requiring the district court to dismiss the action will decrease the friction between the state and federal courts.

### 5.   Whether there is an alternative remedy that is better or more effective?

The Receivers argue that the Mississippi litigation presents a better remedy, because a coercive action is an inherently more effective litigation vehicle, because the Receivers proceed in one action in the Mississippi litigation, rather than the two actions in the district court and this court, and because the parties are naturally aligned in the Mississippi litigation, noting with respect to this last point the evident misstatements in the district court's opinion switching the two sets of parties. AmSouth notes that the material witnesses reside in Tennessee, the underlying events occurred in that state, relevant documents are located in Tennessee, and Tennessee law will likely govern. The Receivers reply that Tennessee and Mississippi are adjacent, reducing the burden of travel, that two-thirds of the total loss suffered was by Mississippi

insurance companies, and that the scheme was nationwide, with documents in numerous fora.

The existence of a coercive action is important to our determination that this declaratory action would serve no useful purpose. *See, e.g., Albie's Foods, Inc. v. Menusaver, Inc.*, 170 F. Supp. 2d 736, 740 (E.D. Mich. 2001) (relying on *Tempco* in deferring to a subsequently-filed coercive action, noting that invocation of coercive remedy will "help sharpen and refine the issues to be decided"); *Pakideh v. Ahadi*, 99 F. Supp. 2d 805, 807-09 (E.D. Mich. 2000) (dismissing declaratory judgment action in favor of coercive action pending in other federal district court after removal); *Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912, 915-17 (N.D. Ind. 2000) (dismissing first-filed declaratory judgment in favor of coercive action in other federal court because to do otherwise would discourage settlement and encourage costly duplicate litigation). Beyond recognizing that an alternative remedy exists, we are unsure that this factor weighs heavily in favor of or against entertaining these declaratory actions.

Ultimately, then, two factors, that the declaratory judgments would serve no useful purpose and that FTB and AmSouth are using these actions for the purpose of procedural fencing, weigh heavily in favor of declining jurisdiction over these declaratory actions, with no factors weighing in favor of proceeding with the declaratory-

judgment action.[8]    The district court therefore abused its discretion in entertaining these actions.

### III. CONCLUSION

For the foregoing reasons, we **DISSOLVE** the injunction, **REVERSE** the district court's decision, and **REMAND** the case to the district court with instructions to dismiss the actions.

---

[8]The district court also relied on the first-filed rule in denying the Receivers' motion to dismiss, which was likely improper, in that the first-filed rule only applies to two cases filed in separate federal courts, *see Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, No. 00-3183, 2001 WL 897452, *3 (6th Cir. July 31, 2001) ("The first-to-file rule is a well-established doctrine that encourages comity among *federal* courts of equal rank." (emphasis added)) *Healthcare Capital, LLC v. Healthmed, Inc.*, 213 F. Supp. 2d 850, 856 (S.D. Ohio 2002), and the Mississippi litigation was filed in state court. In any case, the first-filed rule is not a strict rule and much more often than not gives way in the context of a coercive action filed subsequent to a declaratory action. *See, e.g.,* Zide, 2001 WL 897452 at *3 ("A plaintiff, even one who files first, does not have a right to bring a declaratory judgment action in the forum of his choosing".); *Essex*, 100 F. Supp. 2d at 915-17 (dismissing first-filed declaratory judgment in favor of subsequent coercive action in other federal court); *UAW*, 1999 WL 33237054 at *6 ("Cases construing the interplay between declaratory judgment actions and suits based on the merits of underlying substantive claims create, in practical effect, a presumption that a first filed declaratory judgment action should be dismissed or stayed in favor of the substantive suit."); *Nortek, Inc. v. Molnar*, 36 F. Supp. 2d 63, 70 (D.R.I. 1999) (dismissing first-filed declaratory judgment in favor of subsequent coercive action).