**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1945**

_____

In re:  ESTATE OF LARRY W. COOK, Deceased.

------------------------------

JANINE SATTERFIELD, in her capacity as Administrator for the Estate of Larry
W. Cook, Deceased,

> Plaintiff - Appellant,

> v.

WELLS FARGO BANK, N.A.; NAVY FEDERAL CREDIT UNION,

> Defendant - Appellees.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Claude M. Hilton, Senior District Judge.  (1:23−cv−00009−CMH−LRV)

_____

Submitted:  March 3, 2025                                    Decided:  August 6, 2025

_____

Before KING, RUSHING, and BENJAMIN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Benjamin wrote the opinion, in which Judge King
and Judge Rushing joined.

_____

**ON BRIEF:**  L. Steven Emmert, SYKES, BOURDON, AHERN & LEVY, PC, Virginia
Beach, Virginia; Kimberley A. Murphy, Lisa M. Campo, Justin B. Berger, HALE BALL
MURPHY, PLC, Fairfax, Virginia, for Appellant.  Heather B. Chaney, Tysons, Virginia,

Kathryn M. Barber, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee Wells Fargo Bank, N.A.  Mary C. Zinsner, Washington, D.C., David M. Gettings, Virginia Beach, Virginia, Elizabeth Holt Andrews, TROUTMAN PEPPER HAMILTON SANDERS LLP, San Francisco, California, for Appellee Navy Federal Credit Union.

———————————

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

After a stroke noticeably diminished his cognitive capacity, James Cook fell victim to a swindler impersonating Amazon.com, Inc. ("Amazon"). Over the course of the months-long scam, Cook wired upwards of $3 million to overseas accounts through Navy Federal Credit Union ("Navy Federal") and Wells Fargo (collectively, "the Banks"). Following his death, Cook's niece and administrator of his estate, Janine Satterfield, sued the Banks for "assumption of voluntary duty," "breach of implied covenant of good faith and fair dealing," and "negligence/voluntary assumption of duty." The district court dismissed the suit for failure to state a claim. Satterfield moved to alter or amend the judgment, and the district court denied the motion. Finding no error in those decisions, we affirm the district court's judgment in full.

## I.

Because this appeal involves the district court's denial of Satterfield's complaint under Fed. R. Civ. P. 12(b)(6), "we take 'as true all of the factual allegations contained in the complaint [and its exhibits]' and state the facts in the light most favorable to the plaintiff." *See M.P. ex. rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 521 (4th Cir. 2025) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

## A.

Larry Cook was a highly decorated Navy Veteran. After two decades in the Navy and two decades as a government contractor, Cook had a net worth of approximately $8–

10 million. Beyond his career earnings, Cook was the trustee and beneficiary of a trust valued at $2 million. He also managed two of his own rental properties and his mother's assets before her death.

Cook maintained bank accounts at Wells Fargo and Navy Federal, which he had opened in the 1970s. Before 2020, he never sent a wire payment, foreign or domestic, and "was a very conservative spender" who didn't "spend money until necessary." J.A. 215, 218.[1] Cook was a meticulous record keeper, retaining all of his tax returns and a variety of other records.

Cook suffered an acute right hemisphere stroke in July 2019. Cook's stroke "left him with left sided weakness and impaired sensation, impaired coordination and unstable gait, facial droop, and cognitive impairment including emotional lability, impulsiveness, impaired judgment, and impaired insight with denial." *Id.* 215–16. After his stroke, Cook was forced to retire because "he was no longer capable of working to the level he had been." *Id.* 216. Cook did nothing to administer the trust and became unresponsive to its other beneficiaries. He stopped filing tax returns for himself, his mother, and the trust.

Cook, who was unmarried and not in touch with any relatives, grew increasingly isolated and therefore increasingly vulnerable to undue influence and financial exploitation. On October 5, 2020, Cook received a scam email from a sender purporting to be Amazon. The email indicated Cook had bought a PlayStation Console and an iPad

---

[1] Citations to the briefs use the page numbers generated by this court's CM/ECF system.

4

for $677, and that if he desired to cancel his order, he should call the number listed. Cook's handwritten notes on a printout of the email indicate that Cook called "Amazon" to cancel the order the next day. *Id.* 321. That same day, apparently prompted by the scam email, Cook visited Navy Federal's Vienna, Virginia branch and for the first time wired money to an account holder at Standard Chartered in Singapore. He also called Navy Federal to determine his checking account balance, stating, "We're moving money around due to an infraudulent [sic] charge on another system, and I need to validate what the current balance is." *Id.* 217.

After "basically liquidating his [Navy Federal] checking account" through fifteen wire payments, Cook sent a wire payment from his Wells Fargo checking account to the Bank of Bangkok. *Id.* 218. When Cook tried to send a second international wire from his Wells Fargo checking account, for reasons unknown, Wells Fargo denied his attempt. Cook subsequently wired the money to his Navy Federal checking account instead. Five days later, Navy Federal allowed Cook to send the same wire payment Wells Fargo had denied.

All in all, in the seven months leading up to his death in April 2021, Cook sent seventy-five wire transfers totaling $3,680,700 to Standard Chartered and Bank of Bangkok account holders. Nearly all transfers were in the amount of $49,500. Transfers were sent to "what appears to be a fictious name and address" for the stated purpose of "Loan Repayment." *Id.*

Cook's repeated international wire transfers did not go unnoticed. After Cook had sent nearly three dozen wires—and as he continued to wire money—a Navy Federal

5

representative reported Cook to Fairfax County Adult Protective Services ("APS") for "incoming wires and outgoing wires [that] were conducted in a manner indicative of possible elder financial exploitation." *Id.* 219, 494–95 (APS report). APS opened an investigation, but Cook repeatedly refused to meet with the investigator or provide any information. So, while APS determined that Cook needed protective services, it closed its investigation. Before doing so, APS referred the case to the Federal Bureau of Investigation and "communicated to [Navy Federal] that there was a risk for financial exploitation and asked that [Cook's] accounts continued to be monitored." *Id.* 200. Even so, Navy Federal continued to allow Cook's wire payments until he died.

### B.

Janine Satterfield, the Administrator of Cook's estate, sued the Banks in the Circuit Court for Fairfax County. Navy Federal motioned to remove the case to the United States District Court for the Eastern District of Virginia, and the Banks subsequently moved to dismiss under Fed. R. Civ. P. 12(b)(6). Before the district court ruled on the motion to dismiss, Satterfield filed an Amended Complaint. The Amended Complaint asserted three claims against Navy Federal—assumption of voluntary duty, breach of implied covenant of good faith and fair dealing, and negligence/voluntary assumption of duty—and one claim against Wells Fargo for breach of implied covenant of good faith and fair dealing. The Banks moved again to dismiss under Fed. R. Civ. P. 12(b)(6).

While the motions to dismiss were pending, Satterfield and Navy Federal jointly moved to stay discovery. J.A. 3–4; *In re Est. of Cook*, No. 1:23-CV-00009-CMH-LRV (E.D. Va., PACER No. 25). The magistrate judge granted the motion and continued the

6

parties' initial pretrial conference and the deadline for their proposed joint discovery plan until after the scheduled hearing on the motions to dismiss. Roughly a month after the hearing on the motions to dismiss, but before the district court had ruled on the Banks' motions, the Banks filed a second motion to stay discovery until the pleadings were settled. Satterfield opposed the second motion and attached to her opposition a copy of her discovery requests, including a request for any agreements between Navy Federal and Wells Fargo or between the Banks and Cook. J.A. 4; *Cook*, PACER No. 44. The magistrate judge granted the motion in part, declining the Banks' request for an open-ended stay but ordering that discovery would be stayed "until the earlier of (a) May 31, 2023, or (b) the issuance of an order on the pending motions to dismiss." J.A. 5. Satterfield did not object to the magistrate judge's ruling.

The district court ultimately granted the Banks' motions to dismiss. Satterfield filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), to which she attached an affidavit from Sean Gray, the APS social worker who had investigated Cook's transfers ("Gray Affidavit"). Satterfield's motion to amend or alter the judgment contained no argumentation whatsoever, but it did end with a request for permission to file an amended complaint.[2] Navy Federal moved to strike the affidavit. Without ruling on the motion to strike, the district court denied Satterfield's Rule 59(e) motion.

---

[2] To be clear, Satterfield's fly-by reference to amending her complaint in her Rule 59(e) motion is not a motion to amend her complaint. Rule 59 deals only with altering and amending *judgments*. *See* Fed. R. Civ. P. 59. Motions to amend *pleadings* are a separate category of motions brought under Rule 15. *See* Fed. R. Civ. P. 15.

7

On appeal, Satterfield challenges the district court's Rule 12(b)(6) dismissal, its denial of her Rule 59(e) motion, and the magistrate judge's second stay of discovery. We address Satterfield's 12(b)(6) and 59(e) challenges in turn.[3]

## II.

This Court reviews de novo a district court's order granting a motion to dismiss under Rule 12(b)(6), "accept[ing] the factual allegations of the complaint as true and constru[ing] them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## A.

Wire transfer agreements in Virginia are governed by Article 4A of the Virginia UCC. Article 4A is

> intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular

---

[3] We need not address Satterfield's discovery challenge because it does not meet the plain requirements of the Federal Rules of Civil Procedure. On appeal, Satterfield argues that the district court erred by not "order[ing] production of the intermediary agreement [and customer service agreements] between [Navy Federal] and Wells Fargo" and not allowing her to amend her complaint based on those agreements. Appellant's Br. (ECF No. 20) at 31. But, contrary to Rule 72(a)'s requirements, Satterfield did not "serve and file objections to the [magistrate judge's] order within 14 days of being served with a copy." *See* Fed. R. Civ. P. 72(a). Indeed, she never objected at all. J.A. 5–6. Because Satterfield did not challenge the order then, she may not challenge it now. *See* Fed. R. Civ. P. 72(a).

8

> provisions of the Article.  Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Va. Code Ann. § 8.4A-102 cmt.  To that end, the Virginia Court of Appeals has held that banks' only sources of liability for executing wire transfers in situations covered by Article 4A of the Virginia UCC are those contained within the statute or "an express agreement to the contrary"—i.e., breach of contract claims.  *See Navy Fed. Credit Union v. Lentz*, 890 S.E.2d 827, 831–32 (Va. Ct. App. 2023) (citing Va. Code Ann. § 8.4A-102 cmt.).

*Lentz*, the leading case on point, is instructive.  Citing the Bank Secrecy Act ("BSA") and Va. Code § 63.2-1606, Lentz sued Navy Federal alleging negligence for its failure to detect a similar wire fraud scam, negligence per se, and breach of contract.  *Id.* at 829.  Navy Federal first filed a demurrer, which the circuit court overruled, and then filed a motion for summary judgment, which the circuit court granted in part and denied in part.  *Id.*  On appeal, Navy Federal challenged the circuit court's overruling of its demurrer and its denial in part of its motion for summary judgment.  *Id.*

The Virginia Court of Appeals reversed the circuit court in full.  *Id.* at 832.  It held that the Virginia UCC preempts common law claims that conflict with Article 4A and any express agreements between the parties.  Because Article 4A "directly addresses whether a bank has a duty to refrain from acting with respect to a duly authorized wire transfer order from its customer[,] [a]bsent an express agreement to the contrary," no such duty exists.  *Id.* at 831–32; *see id.* at 831 n.7 (distinguishing *Schlegel v. Bank of Am., N.A.*, 628 S.E.2d 362 (Va. 2006), wherein court allowed some common-law claims against bank where common-law claims in question were not addressed by UCC provisions).  The express

9

agreement between Navy Federal and Lentz only made Navy Federal liable to Lentz if her wire transfer was not "1) completed on time; 2) in the correct amount; or 3) sent to the correct recipient." *Id.* at 831. Because Lentz's claims were not grounded in Article 4A or the terms of the agreement, they were preempted. *Id.* at 832.

Consistent with federal courts across the country, the *Lentz* court also held that the BSA does not create a private right of action or any duties between banks and their customers. *Id.* at 830; *see, e.g.*, *AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004) ("[T]he Bank Secrecy Act does not create a private right of action[.]"); *James v. Heritage Valley Fed. Credit Union*, 197 F. App'x 102, 106 (3d Cir. 2006) ("[T]he Bank Secrecy Act . . . does not authorize a private cause of action against a financial institution or its employees."); *Palmieri v. United States*, 209 F. Supp. 3d 95, 98 (D.D.C. 2016) ("Private parties do not have a cause of action to enforce the BSA."); *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) ("[B]ecause the Bank Secrecy Act does not create a private right of action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements."). Instead, the only duties "created by the BSA are those owed by a bank . . . to the federal government." *Lentz*, 890 S.E.2d at 830.

In the same vein, the court in *Lentz* held that Virginia's APS laws do not create a duty of care between banks and elderly customers, explaining that it "decline[d] to extend a duty to mandate the reporting of elder abuse or to mandate an action by a financial institution when elder abuse is suspected where the plain language of a statute clearly says otherwise." *Id.* at 831; *see also id.* at 830–31 (observing that "[t]he legislature specifically

10

used the permissive 'may' as opposed to 'must' or 'shall' " and "established a procedure that was permitted but not required to be instituted when a financial institution suspected financial exploitation").

## B.

On appeal, Satterfield attempts to distinguish *Lentz* on the facts of Cook's exploitation and the timing of the Banks' actions, which allegedly give rise to liability. Reply Br. (ECF No. 28) at 6–7, Appellant's Br. (ECF No. 20) at 17–18 (hereinafter "Opening Br."). Based on *Lentz*'s purported inapplicability, Satterfield argues that banks owe a baseline duty of care to their customers under Virginia law and that the BSA imposes an additional duty of care beyond Article 4A's requirements. Furthermore, because Navy Federal reported Cook's possible exploitation to APS, Satterfield argues that Navy Federal assumed a voluntary duty to protect Cook.

The Banks counter that Satterfield's attempts to distinguish *Lentz* do not change the Virginia Court of Appeals' reasoning. Under *Lentz*, the Banks had no duty "to accept a payment order or, before acceptance, to take any action, or refrain from taking action, with respect to the order except as provided in [the Virginia UCC] or by express agreement." Appellees' Br. (ECF No. 22) at 32–33 (hereinafter "Resp. Br.") (quoting *Lentz*, 890 S.E.2d at 831). Accordingly, the Virginia UCC preempts claims not contained in the contracting parties' express agreements or otherwise provided for by the Virginia UCC itself. The Banks also argue that the BSA does not impose a heightened standard of care, and Virginia law has no "assumption of voluntary duty" cause of action.

11

C.

We agree with the Banks. The district court properly dismissed all three of Satterfield's claims.

1.

Regarding Satterfield's "assumption of voluntary duty"[4] and "negligence/voluntary assumption of duty" claims, *Lentz* is directly on point. Because Satterfield's claims rely on a duty not contained within Article 4A of the Virginia UCC or an express agreement between the parties, both claims must fail. *See Lentz*, 890 S.E.2d at 831–32 (citing Va. Code Ann. § 8.4A-102 cmt.); *see also id.* at 832 (explaining that "[a]bsent an express agreement to the contrary," "a bank has [no] duty to refrain from acting with respect to a duly authorized wire transfer order from its customer").

Satterfield attempts to distinguish *Lentz* on the facts of Cook's exploitation,[5] including Cook's purported lack of capacity, the larger sum of money lost, the greater

---

[4] As the district court observed, "[Satterfield's] first claim, 'assumption of voluntary duty,' is not recognized under Virginia law." J.A. 628. A duty may arise between parties when one party "[takes] charge of or exercise[s] control over" the other, thereby creating a special relationship. *Nasser v. Parker*, 455 S.E.2d 502, 505 (Va. 1995). In her complaint, Satterfield alleged that when Navy Federal reported Cook to APS, it formed that "special relationship." J.A. 15. But when Navy Federal reported its suspicions about Cook's exploitation to APS, it neither "took charge of" nor "exercised control over" Cook. *See Nasser*, 455 S.E.2d at 505. Therefore, no duty ever arose between Cook and Navy Federal.

[5] Satterfield also claims to challenge the Banks' conduct "before" the transfers, rather than their execution thereof. But Satterfield does not identify an action the Banks should have taken before processing the wire payments that is not itself related to the execution of the payments. In fact, in her Reply Brief, she collapses any distinction that could have existed. *Compare* Opening Br. at 18 ("But the issue here is not whether NFCU or Wells Fargo properly *executed* the wire transfers in accordance with Article 4A and (Continued)

12

number of transfers, the allegedly more suspect recipients, and the Banks' suspicion of fraud and referral of Cook to APS. Reply Br. (ECF No. 28) at 6–7. But those distinctions do not matter. The Court of Appeals' rationale for determining that Article 4A preempted the plaintiff's common-law claims was not fact-specific but based on Article 4A's text and the legislature's comments to the law. *See Lentz*, 890 S.E.2d at 829–32.

Satterfield's theories about other sources of duty are also wrong on the law. The BSA does not create a private right of action. *See AmSouth Bank*, 386 F.3d at 777; *Heritage Valley*, 197 F. App'x at 106 (same); *Palmieri*, 209 F. Supp. 3d at 98 (same); *In re Agape Litig.*, 681 F. Supp. 2d at 360. We therefore "perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements." *See In re Agape Litig.*, 681 F. Supp. 2d at 360. And the Court of Appeals of Virginia has already "decline[d] . . . to mandate an action by a financial institution when elder abuse is suspected where the plain language of a statute clearly says otherwise." *See Lentz*, 890 S.E.2d at 831.

Satterfield's position that imposing liability for wire transfers outside the UCC and express agreements would not "thwart" Article 4A's purpose is equally infirm. "The UCC rules concerning wire transfers set forth in Article 4A represent 'a careful and delicate balancing of [competing] interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties.' " *Lentz*, 890 S.E.2d at

---

standard banking practices. It was what duty they owed to [Cook] before issuing the transfers."); *with* Reply Br. (ECF No. 28) at 7 ("[The Banks] breached their duty to [Cook] by knowingly and purposely reviewing, accepting and sending for processing wires that were blatantly in violation of other statutes[.]").

13

831 (quoting Va. Code Ann. § 8.4A-102 cmt.).  In that way, Article 4A seeks to limit banks' liability so that they may "predict risk with certainty, . . . insure against risk, . . . adjust operational and security procedures, and . . . price funds transfer services appropriately."  Va. Code Ann. § 8.4A-102 cmt.  Allowing suits outside of Article 4A's careful design inherently upsets that "delicate balance[]," thereby frustrating the stated purpose of the Virginia UCC.  *See id.*

Dismissal of Satterfield's "assumption of voluntary duty" and "negligence/voluntary assumption of duty" claims was therefore proper.

### 2.

Regarding Satterfield's "breach of the covenant of good faith and fair dealing" claim, "[a] 'breach of the implied duty under the U.C.C. gives rise only to a cause of action for breach of contract,' and not an independent tort."  *Ado Home Servs., LLC v. Frykman*, No. 0414-24-4, 2025 WL 1633958, at *13 n.13 (Va. Ct. App. June 10, 2025) (quoting *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 385 (Va. 1996)).  In other words, Satterfield cannot use the implied covenant of good faith and fair dealing to "rewrit[e] an unambiguous contract in order to create duties that do not otherwise exist."  *See Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) (citations omitted)*.*  So, to show breach of contract here, Satterfield must plausibly allege the Banks had a contractual obligation to investigate Cook's "suspicious" wire transfer orders.  *See Minnesota Laws. Mut. Ins. Co. v. Batzli*, 442 F. App'x 40, 47 (4th Cir. 2011) (quoting *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 379 S.E.2d 316, 317 (Va. 1989)); *Lentz*, 890 S.E.2d at 831–32; J.A. 16.  But Satterfield has identified no such

14

obligation. J.A. 16–17. She alleges only that the Banks "breached the covenant of good faith and fair dealing." *See* J.A. 16. Her "breach of the covenant of good faith and fair dealing" claim therefore fails, and the district court's summary 12(b)(6) dismissal was proper.

### III.

We review the denial of a Rule 59(e) motion for abuse of discretion. *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 407 (4th Cir. 2010) (citing *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006)). Per Rule 59(e), "a court may alter or amend [its] judgment if the movant shows either (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Id.* at 407 (citing *Ingle*, 439 F.3d at 197).

Satterfield argues that the Gray Affidavit is "newly discovered evidence" because Gray came forward in response to media coverage of the case, and the contents of his affidavit are non-cumulative, material, and "highly likely to produce a new outcome." Opening Br. at 26. The Banks argue that the content of the Gray Affidavit was not new, and because Gray was listed in the Social Services report Satterfield has possessed from the outset, she could have secured his affidavit earlier. Resp. Br. at 45–46. The Banks also argue that the Gray Affidavit does not cure the deficiencies for which the Amended Complaint was dismissed.

We agree with the Banks. Gray was listed on the first page of the APS report which Satterfield attached to both her original complaint and the Amended Complaint. J.A. 193,

15

494. Satterfield could have pursued Gray's account not just before judgment, but before filing. *See Robinson*, 599 F.3d at 407 (citing *Ingle*, 439 F.3d at 197). The content of the affidavit was also not new. In substance, the affidavit merely retells the story contained in the APS report, albeit with additional color and speculation. *Compare* J.A. 710–12 (Gray Affidavit), *with id.* 193–206 (original complaint APS report), *and id.* 494–507 (amended complaint APS report); *see Robinson*, 599 F.3d at 407 (citing *Ingle*, 439 F.3d at 197). Containing no new information, the Gray Affidavit would have no impact on the outcome of the case because it does not cure the deficiencies in the Amended Complaint. Satterfield therefore fails to prove her sole ground for challenging the district court's denial—that the Gray Affidavit provides new evidence that was unavailable earlier. Accordingly, we affirm the district court's denial of Satterfield's Rule 59(e) motion.

## IV.

Though the facts of Larry Cook's financial exploitation in his final months are sad and disturbing, the law is clear. We therefore affirm the district court in full.

*AFFIRMED*

16